+THE OHIO OIL COMPANY v. THOMAS C. KELLEY ET AL.

1. OF WHAT COURTS WILL TAKE JUDICIAL NOTICE.

Courts will take notice of whatever ought to be generally known within the limits of their jurisdiction.

2. CONSTRUCTION OF CONTRACTS.

In construing a contract effect should be given to all its language.

3. GRANT OF GAS AND OIL CONSTRUED.

A grant—conveying all the gas or oil under certain premises—with an exception and reservation to the grantee of a certain part of the minerals produced, and containing a clause: "All wells to be drilled on said land are to be drilled within three years," and limiting the grant to a term of years, is a lease.

4. HOW SUCH LEASE IS GOVERNED.

Such lease is governed and controlled by rules of law, applicable to lease of land for general tillage.

---

* The judgment in this case was affirmed by the Supreme Court; opinion, 57 O. S., 317. The circuit decision, as to operations, is distinguished in Baldwin v. Oil Co , 7 Circ. Dec., 50, 54; also in Wichman v. Oil Co., 6 Dec., 540, 540, as to boundary lines.

**5. CLAUSE LIMITING TIME FOR DRILLING CONSTRUED.**

The clause, "All wells to be drilled on said land are to be drilled within three years," after the expiration of three years, it is a mutual covenant; before the expiration of three years, it is a covenant obligatory alone upon the lessee.

**6. HOW COVENANT MUST BE PERFORMED.**

The lessee's covenant must be performed honestly, fairly, reasonably and in good faith.

**7. RELIEF GRANTED IN EQUITY.**

Equity will grant relief at the instance of the lessor for a violation of the provisions of the lease.

APPEAL from the court of common pleas of Hancock county.

SENEY, J.

On the 11th day of November, 1890, the plaintiff, "The Ohio Oil Company," by its president, William Fleming and the defendant, John H. Hastings, signed and executed the following instrument:

"In the consideration of the sum of sixteen hundred and fifty dollars, the receipt of which is hereby acknowledged, John H. Hastings, of Findlay, Ohio, first party, hereby grants unto the Ohio Oil company, an Ohio corporation, second party, its successors and assigns, all the oil and gas in and under the following described premises, together with the right to enter thereon at all times for the purpose of drilling and operating for oil, gas or water, and to erect and maintain all buildings and structures, and lay all pipes necessary for the production and transportation of oil, gas or water from said premises. Excepting and reserving, however, to first party the one-sixth part of all oil produced and saved from said premises, to be delivered in the pipe line with which said second party may connect its wells, namely: All that certain lot of land in the township of Findlay, county of Hancock, in the state of Ohio, bounded and described as follows, to wit: The west half of the northwest quarter of section No. one, and the east half of the northeast quarter of section No. two, township one north, range ten east, being the same farm on which first party now resides, containing one hundred and sixty-five acres, more or less. To have and hold the above premises on the following conditions:

If only gas is to be found, second party agrees to pay three hundred dollars each year, in advance, for the product of each well while the same is being used off the premises, and first party to have gas free of cost to heat four stoves in dwelling house during the same time.

Whenever the first party shall request it, second party shall bury all oil and gas lines, and pay all damages done to growing crops by reason of burying and removing said pipe lines.

No well shall be drilled nearer than 250 feet to the house or barn on said premises, and no well shall occupy more than one acre.

The second party shall have the right to use sufficient gas, oil or water, to run all necessary machinery for operating said wells, and also the right to remove all his property at any time.

All wells to be drilled on said land are to be drilled within three years from this date, and this contract shall expire ten years from this date. Second party shall pay all damage to growing crops going to and from the place of operation. It is understood between the parties to this agreement that all the conditions between the parties hereunto shall extend to their heirs, executors and assigns.

In witness whereof, the parties hereunto set their hands and seals this 11th day of November, A. D. 1889.

Signed, sealed, acknowledged and delivered in the presence of, etc.

The Ohio Oil company, by virtue of this instrument, paid Hastings the sum of sixteen hundred and fifty dollars.

Prior to the 11th day of November, A. D. 1892, being within three years from the date of the instrument, the Ohio Oil company drilled seven wells upon said premises, four of said wells being located within 200 feet of the north boun-

dary line of said premises; two of said wells being located within 200 feet of the south boundary line of said premises; and one of said wells being located within — feet of the west boundary line of said premises; each of said wells being operated by the Ohio Oil company, and each of said wells producing oil. From the product of said wells the Ohio Oil company have given, and the said Hastings has received one-sixth part thereof.

That the entire premises of one hundred and sixty-five acres, is an oil producing farm, which was well known to the Ohio Oil company.

That a fair and reasonable operation of the said one hundred and sixty-five acres within three years, and during the term provided by said written instrument required the drilling and operation of at least eight additional wells in addition to the seven wells drilled by the Ohio Oil company. which was well known to the Ohio Oil company.

That it is a custom among oil operators to an extent that it is a rule, which was well known to the Ohio Oil company, that in order to protect the oil under the premises operated, that it is absolutely necessary to drill wells close to the boundary lines of the immediate adjoining lands, especially in case the operators of said adjoining lands drill wells close to said boundary lines.

That the Ohio Oil company, by deed and contracts, are the owners of the lands immediately adjoining the said one hundred and sixty-five acres upon each side thereof; that it has drilled wells to a large number upon each of said tracts owned and controlled by it, and contemplates the drilling of additional wells upon said tracts, to an extent to fully develop, produce and bring to the surface of the earth, all of the oil that underlie each of said tracts thus adjoining said one hundred and sixty-five acres owned by said Hastings.

That each of said wells, thus drilled by said The Ohio Oil company, upon said adjoining tracts of land are oil producers.

That the said Ohio Oil company have drilled some wells upon said adjoining tracts of land so owned and contracted by it, close to the boundary line of said one hundred and sixty-five acres so owned by Hastings, but in order to protect the oil under said one hundred and sixty-five acres as provided by the aforesaid rule, it did not drill sufficient wells to afford the protection contemplated by said rule, notwithstanding the said Hastings, within the three years provided by said written instrument, requested the Ohio Oil company to drill additional wells for his protection, all of which the said Ohio Oil company refused and neglected to do.

That the seven wells drilled upon said one hundred and sixty-five acres within the said three years as aforesaid, are the only wells drilled by the said Ohio Oil company upon said premises, and the only wells ever attempted or offered to be drilled by it, until the filing of the reply in this case, to-wit, on the 20th day of December, 1894.

That on the 25th day of October, 1894, the defendant, Hastings, by an instrument in writing, duly granted to the defendant, Kelley, the right to drill eight wells for oil upon said one hundred and sixty-five acres, said wells being located and staked off, and said wells thus located and staked off were not nearer than six hundred feet to the seven wells drilled by the Ohio Oil company.

That prior to the commencement of this action, the defendant, Kelley, by virtue of said instrument in writing, commenced and had partly drilled a well upon said one hundred and sixty-five acres, to-wit, nearly in the center thereof.

That since the commencement of this action, said well thus partly drilled by Kelley, has been completed and is what is termed a good oil producer. That the well thus drilled by Kelley does not interfere or diminish the quantity of the oil produced by the seven wells drilled by the Ohio Oil company.

It is a theory among oil operators that where oil wells are drilled not less than six hundred feet apart, that one well thus drilled will not interfere or diminish the oil produced by another well, thus drilled.

Upon the facts thus stated the Ohio Oil company ask from a court of equity a perpetual injunction to restrain and enjoin the defendants from operating or drilling upon the said one hundred and sixty-five acres of land. Shall this injunction be granted? is the question presented for our determination.

The case is somewhat novel, and in many of the features we are without guide or precedent so far as judicial determination is concerned, and hence as to those features we are necessarily compelled to resort to general principles. At the threshold of the case, the question arises, What is the character or nature of the subject matter of this written instrument? This can best be answered by the opinion of Justice WILLIAMS in the case of *Wettengel* v. *Gornelly*, 160 Pa. St., page 559. I quote from page 567: "It is well understood among oil operators that the fluid (gas or oil) is found deposited in a porous sand rock, at a distance ranging from five hundred to three thousand feet below the surface. This rock is saturated throughout its extent with oil, and when the hard stratum overlying it is pierced by the drill, the oil and gas find vent, and are forced by the pressure to which they are subjected into and through the well to the surface. After this pressure is relieved by the outflow, the wells become less active. The movement of the oil in the sand rock grows sluggish, and it becomes necessary to pump the wells in order both to quicken the movement of oil from the surrounding rock, and to lift it from the chamber at the bottom of the well to the surface. An oil or gas well may thus draw its product from an indefinite distance and in time exhaust a large space. Exact knowledge on this subject is not at present obtainable, but the vagrant character of the mineral, and the porous sand rock in which it is found and through which it moves, fully justify the general conclusion we have stated above, and have led to its general adoption by practical operators."

And we might add, gas or oil, like water percolating through the soil—no one can tell, as to the water thus produced, whence it comes and whither it goes. It is here today and gone tomorrow.

As to the characteristics of the subject matter of this written instrument, we have no evidence or facts, but we take judicial notice of it.

I cite in support of this, the case of *Brown* v. *Spillman et al.*, decided in the supreme court of the United States, at its October term, 1894, wherein they say: "Courts will take notice of whatever ought generally to be known within the limits of their jurisdiction." So that on the 11th day of November, 1889, when this written instrument was executed, the contracting parties contracted with reference and knowledge as to the peculiar characteristics of the subject matter of their contract, and in construing this written instrument, this is an element that must enter into its legal construction, in order to determine the legal rights of the parties thereunder.

It is contended by the Ohio Oil company, that by reason of the fact that this written instrument contains a grant of all the gas and oil under the one hundred and sixty-five acres, hence the Ohio Oil company is entitled to it. This is not sound law. I cite the case of *Brown* v. *Spillman*, *supra*, wherein they say: "In construing a contract effect should be given to all its language." This is but an elementary principle of law.

The grant is, "All the oil and gas in and under the one hundred and sixty-five acres excepting and reserving to Hastings the one-sixth part of all oil produced and saved from said premises."

The exception and reservation is nothing more or less than a part of the consideration for the grant.

It will be noticed that the written instrument contains no expressed provision that the Ohio Oil company shall drill any wells. This, although not expressed by reason of the exceptions and reservations contained in the written instrument, is implied.

I cite from the opinion of the court in the case of *Ray* v. *Natural Gas Co.*, 138 Pa. St., page 589, wherein they say: "The clear purpose of the lessor was

to have his lands operated for oil or gas, and the condition was inserted for his benefit. Whilst the obligation on the part of the lessee to operate is not expressed in so many words, it arises by necessary implication.".

Again, I cite from the opinion of the court in the case of *Glasgow* v. *Chartier's Oil Company*, 152 Pa. St., page 52, wherein they say:

"If he explores and finds oil or gas, the relation of landlord and tenant or vender and vendee is established, and the tenant will be under an implied obligation to operate for the common good of both parties, and pay the rent or royalty reserved." Thus far we have seen it was the legal duty of the Ohio Oil company to operate this one hundred and sixty-five acres for the "common good" of itself as well as the defendant, Hastings.

We next consider, what is the legal character of this written instrument? Does it partake of the same character as a written instrument affecting the developing of coal mines or other mineral mines, the substance of which have a *situs*, or is it to be governed by the rules applicable to the relation of landlord and tenant? This question is best answered by the supreme court of Pennsylvania in the case of *Wettengel* v. *Gornelly, supra*, page 559, which reads: "Owing to the vagrant character of oil and gas, a lease of these substances partakes of the character of a lease for general tillage rather than a lease for mining or quarrying the solid minerals." And also from the opinion on page 567:

"For this reason an oil lease partakes of the character of a lease for general tillage rather than that of a lease for mining or quarrying the solid materials.

"In the case of a coal lease, for example, the exact location, with reference to lines on the surface, of every pound of coal taken out can easily be determined. The stratum of coal is as fixed and permanent in its character as are the strata of superincumbent rocks and earth. The removal of the coal from one purpart does not diminish or disturb that which underlies another. The lines that divide the surface divide with absolute fairness to all concerned, the sub-surface, and secure to the several owners with certainty the mineral that belongs to each. The rules applicable to coal mine leases, or leases of land containing any other solid mineral, are therefore not always capable of application to leases for the production of oil or gas, because of the difference between the solid and the fluid minerals, and because of the different conditions under which they are found and brought to the surface."

From what is cited it will be seen that this instrument must be construed and the law applicable thereto the same as the law applicable to the relation of landlord and tenant. For, notwithstanding the grant with the exception and reservation, when we construe the three years' clause and the ten years' clause, the instrument cannot rise higher in a legal sense than a lease.

Considering now the following clause in said written lease: "All wells to be drilled on said land are to be drilled within three years from this date."

What is the effect and purport of this clause, when considered with the other parts of the instrument?

It is urged by the Ohio Oil company that this clause is a mutual covenant and is alike binding upon Hastings as well as itself. This claim is too broad. While we agree with counsel that with nothing else in the case to prevent its operation, with a single exception after the expiration of the three years, their claim is correct.

This exception is this: As we have seen the parties in making, the contract, contract with reference to the nature and character of the subject matter of the contract, and in so doing, by implication, the lessee being in possession for the purpose and object of the contract, agrees to do all things necessary to protect the fruits growing out of the wells drilled within three years. And we have seen by one of the facts found that protection is being afforded by drilling wells close to the boundary line. So that, by necessary implication, the Ohio Oil company was bound, after the expiration of the three years, as the occasion became necessary for that protection, to dr'l all wells necessary therefor. While this is the

construction to be given to this clause after three years, it has another construction as to the effect within the three years.

As we have seen, from the object and purpose of the contract an implied obligation is created to operate the premises for the common good of both parties. In these operations the lessee is the sole actor. It is within its option and discretion to determine the number of wells within the three years it will drill to accomplish the purpose of the contract, always having in view the nature and character of the subject matter of the contract, as well as the condition of the adjacent surroundings. This discretion thus lodged with the lessee must not be an arbitrary one, but must be an honest discretion. This option thus lodged with the lessee must not be an arbitrary one, but must be an option exercised in good faith, fairly and reasonably, and with an honest intention. Were it otherwise, the premises would not, nor could not be operated for the common good of both parties.

I quote again from the case of *Ray* v. *The Natural Gas Co.*, 138 Pa. St., page 589, wherein they say:

"The lease was for the expressed purpose of drilling and boring for oil or gas, the lessor in a certain event, to receive a share of the production as a royalty or rent, and in another event, to be paid $500 per annum for each gas well the product of which was conducted from the land for consumption. If a farm is leased for farming purposes, the lessee, to deliver to the lessor a share of the crops, in the nature of rent, it would be absurd to say, because there was no express engagement to farm, that the lessee was under no obligation to cultivate the land. An engagement to farm in a proper manner and to a reasonable extent is necessarily implied." Mark the words, " In a proper manner and to a reasonable extent."

If the lessee can exercise an arbitrary discretion or option by reason of paying the $1,650.00, what is the effect? It can say, I will drill no wells, or I will drill but one, etc. And the oil that is under the one hundred and sixty-five acres, instead of coming to the surface on the one hundred and sixty-five acres, from its transitory character would come to the surface from the wells of the Ohio Oil company upon its adjacent lands, and thus defeat a part of the consideration for which the right to the one hundred and sixty-five acres was granted, and that defeat caused by the act of one of the parties, over which the other party had no control.

I again quote from the opinion of the court in the case of *Wettengel* v. *Gornelly, supra,* page 567, wherein they say :

" He may crowd the lines of the adjoining division so as to enable him to draw the oil from them without drilling upon them, and in this manner deplete ultimately the whole territory by operations conducted on the farm of one of the devisees."

I again quote from the first and second paragraphs of the case of *Brown* v. *Spillman, supra,* wherein the court say :

" 1st—Petroleum, gas and oil belong to the owner of the land, and are a part of it so long as they are on it or in it, or subject to his control; but when they escape and go into other land, or come under another's control, the title of the former owner is gone."

" 2d—If an adjoining owner drills his own land, and taps deposit of oil or gas, extending under his neighbor's field, so that it comes into his well, it becomes his property."

But it is contended in effect by the oil company, as there is no clause of forfeiture or condition in the written instrument, conceding this construction is the right one, the remedy of Mr. Hastings, if any he has, is an action at law for damages. Is this sound? It can be tested by the rent of a farm for agricultural purposes. A leases to B his farm for ten years, B agreeing to pay therefor $500 cash rent and one-half the crops raised during the term. He pays his cash rent, but makes no pretense after the first year, to till the soil. After the expiration of

three years A has received no crops, and his farm is going to waste and decay; what is A's remedy? Undoubtedly, an action at law for damages. But inject into the proposition the insolvency of B, then what is his remedy? An appeal to a court of equity for relief, and that court, sitting as a court of conscience, would declare the lease at an end, either upon the ground of an equitable estoppel, or on the ground of fraud—fraud in the performance, which in equity would relate back, and make it fraud in its inception. Why the change of from law to equity? Simply because the law could furnish no relief.

Apply this doctrine to the case before us. Suppose that Mr. Hastings waits for an action at law at the expiration of ten years, what would be the measure of damages? It could not be more than what he had lost. And how would he arrive at his loss? It would depend upon the amount of oil that had been taken from his farm by the failure of the oil company to drill sufficient wells, and how much the oil company had taken from his farm by reason of their drilling upon adjacent land. What this would amount to, no one in the nature of things could tell.

While the supreme court of Pennsylvania, in a different case from the one before us which is reported in the 144 Pa. St., 521, lays down a rule as to the measure of damages, before we would be willing to follow it, the court will have to tell us upon what kind of evidence can the value of a leasehold estate for gas or oil be founded so as to measure the difference in the value of the leasehold before and after the injury was committed?

So that Mr. Hastings cannot be driven to an action at law for damages, for the law could not grant him relief. If the Ohio Oil company had attempted, in good faith, to carry out the spirit, if not the letter, of this contract, it would be in position to pray for the relief they ask at the hands of a court of equity; while from what we have said and found as the facts, it did not act in good faith. It has not done equity towards Mr. Hastings. Then what is its standing in a court of equity? This is determined by well settled principles of equity as old as equity jurisprudence.

I quote from Pomeroy Equity Jurisprudence, section 385, which reads: "He who seeks equity must do equity." Also, see 397: "He who comes into equity must come with clean hands." Also, section 459: "The universal principle is that a court of equity will refuse to aid any party who by the remedy which he seeks to obtain against his adversary, is himself not doing equity, or who does not come before the court with clean hands, the same principle upon which the court acts when it refuses to specifically enforce a contract which is unequal, unjust or has any inequitable features and incidents."

Entertaining these views, there will be a finding and decree for defendants. The petition will be dismissed, injunction dissolved, plaintiff to pay all costs. Judgment for costs, execution awarded, and cause remanded for execution.

DAY and PRICE, JJ., concur.

*John Poe* and *Troup & Elliott*, for Plaintiff.

*Geo. H. Phelps*, for Defendants.